IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN WILLIAMS,                    )
                                  )
            Plaintiff,            )        Civil Action No. 19-101J
                                  )        Magistrate Judge Maureen P. Kelly
      v.                          )
                                  )        Re: ECF Nos. 82 and 84
PENNSYLVANIA DEPARTMENT OF        )
CORRECTIONS; QUEHANNA BOOT        )
CAMP; STEVE GODFREY; TERRI        )
SOMERS, *SIP Program Administrator*, )
HEARING EXAMINER NUNEZ; and       )
CORRECT CARE SOLUTIONS, LLC.      )
                                  )
            Defendants.           )

## OPINION

Plaintiff John Williams ("Williams") initiated this counseled civil rights action alleging claims arising from his confinement and eventual expulsion from an alternative criminal sentencing program. In his Second Amended Complaint, ECF No. 36, Williams brings an Eighth Amendment claim against Defendants Pennsylvania Department of Corrections ("DOC"), Quehanna Boot Camp ("Quehanna"), Steve Godfrey, Terri Somers (collectively, "DOC Defendants"), and Defendant Correct Care Solutions, LLC[1] ("Correct Care") for the alleged denial of basic nutrition in deliberate indifference to his serious medical needs (Count I). Williams also asserts claims against the DOC and Quehanna for the violation of his rights under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (Count II), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 (Count III). Williams' final claim alleges that the DOC

---

[1] In the Second Amended Complaint, Williams also alleges claims against Deborah Cutshall, a Correct Care employee. Upon the completion of discovery in this matter, the parties stipulated that Williams' claims against Cutshall should be dismissed. ECF No. 81 ¶ 98. In light of the parties' stipulation, the Court will dismiss Cutshall from this action.

Defendants and DOC Hearing Examiner Freddy Nunez ("Nunez") violated his Fourteenth Amendment due process rights in the adjudication of a DOC misconduct charge (Count IV).

Presently before the Court are Motions for Summary Judgment filed on behalf of the DOC Defendants and Correct Care, ECF Nos. 82 and 84. For the reasons that follow, the Motion for Summary Judgment filed on behalf of the DOC Defendants will be granted in part and denied in part, and the Motion for Summary Judgment filed on behalf of Correct Care will be granted.[2]

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Due Process - SIP Program Misconduct

In a negotiated agreement entered in January 2016, Williams pleaded guilty to his second and third alcohol-related criminal offenses, committed on January 9, 2015 and February 21, 2015.[3] After evaluation by the DOC, the trial court sentenced Williams to concurrent terms in the Pennsylvania State Intermediate Punishment program ("SIP program") for 2 years and 90 days, and a term of probation for 2 years. Commw. v. Williams, No. CP-02-CR-6938-2015 at 3-4 (CCP Allegheny County). Id. at 4.

The SIP program was authorized by the Pennsylvania General Assembly "to … punish[] persons who commit crimes, but also provide[] treatment that offers the opportunity for those persons to address their drug or alcohol addiction or abuse and thereby reduce the incidents of recidivism and enhance public safety." 61 Pa. C.S. § 4102.[4] At the time of Williams' sentence, the program consisted of four phases, including sixty days for evaluation and processing at a state

---

[2] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case. ECF Nos. 4, 12, and 19.

[3] See Commw. v. Williams, No. CP-02-CR-6938-2015 (CCP Allegheny County), and see Commw. v. Williams, CP-02-CR-0004795-2015 (CCP Allegheny County).

[4] The General Assembly revised the SIP program in 2019. See, 2019 Pa. Legis. Serv. Act 2019-115 (S.B. 501). All statutory citations in this Opinion are to the version in effect at the time of Williams' conviction and sentence.

correctional institution followed by four months in a therapeutic community ("T.C."); two months of community-based in-patient rehabilitation treatment, six months at a community based "half-way house"; and a period of supervised home and community reintegration. The length of the program is twenty-four months, provided the participant does not fail or repeat any element. ECF 81-7 at  24-28; see also 61 Pa. C.S. § 4105(b). The total duration of a sentence incorporating the SIP program "may not exceed the maximum term for which the eligible offender could otherwise be sentenced." 61 Pa. C.S. § 4104 (f).

A participant in the SIP program is subject to transfer at the discretion of the DOC "between a State correctional institution, an institutional therapeutic community, a community-based therapeutic community, an outpatient addiction treatment program and an approved transitional residence." 61 Pa. C.S. § 4105(c). "The department may also transfer a participant back and forth between less restrictive and more restrictive settings based upon the participant's progress or regression in treatment or for medical, disciplinary or other administrative reason." Id. The authorizing statute also provides that, "[a] participant may be expelled from the State drug offender program at any time in accordance with guidelines established by the department, including failure to comply with administrative or disciplinary procedures or requirements set forth by the department." 61 Pa. C.S. § 4105(f)(1).[5]

In accordance with DOC guidelines, most participants are placed at the Quehanna T.C. If a participant is found to abuse drugs or alcohol during any phase of the program, he or she returns to Quehanna for reassessment. Reassessments are conducted by a T.C. program supervisor, in this

---

[5] The statute further provides that the establishment of the SIP program "shall not be construed to: (1) [c]onfer any legal right upon any individual, including an individual participating in the drug offender program, to: (i) participate in a drug offender treatment program; (ii) continue participation in a drug offender treatment program; (iii) modify the contents of the drug offender treatment program; or (iv) file any cause of action in any court challenging the department's determination that a participant is to be suspended or expelled from or that a participant has successfully completed or failed to successfully complete treatment to be provided during any portion of a drug offender treatment program." 61 Pa. C.S. § 4108.

case, Defendant Steve Godfrey. ECF No. 81-4 at 26.  Depending on the results of reassessment, Godfrey may recommend that a participant repeat a program phase or recommend that the inmate be expelled from the program. Id. at 31. If a recommendation to expel a participant is made, the program supervisor issues a misconduct for the pending violation and initiates transfer to the State Correctional Institution at Houtzdale ("SCI – Houtzdale"). Id. at 37-38, 50-51. At SCI – Houtzdale, a hearing examiner, in this case Defendant Nunez, considers the evidence supporting the misconduct and issues a finding that is forwarded to Teri Somers ("Somers"), the state SIP Program Administrator. Somers coordinates and issues disciplinary measures, and may expel the participant from the SIP program. Id. at 52-54. If a decision is made to expel a participant, Somers forwards a letter to the sentencing court regarding the participant's failure to comply with program requirements and asks the court to conduct a resentencing hearing. The assigned Common Pleas Court judge may then resentence the participant to a term of incarceration he or she was eligible to serve absent initial placement in the SIP program.

In the instant case, Williams entered DOC custody in January 2016 with a requirement to undergo evaluation for participation in the SIP program. ECF No. 81-3; and see, Commw. v. Williams, No. CP-02-CR-6938-2015 at 3. After initial evaluation at the State Correctional Institution at Camp Hill ("SCI – Camp Hill"), Williams was sentenced to the SIP program. As of June 8, 2017, he had progressed to placement in Renewal, a community-based halfway house. ECF No. 81 ¶¶ 41-42. Williams agreed to the conditions of his placement, including drug and alcohol testing, an inability to leave the center without permission, and a requirement to return immediately after any work, training, or educational program. Williams also acknowledged that use of drugs or alcohol constitutes a violation that results in automatic revocation of placement at Renewal.  ECF Nos. 81-10 and 81-11.

About seven weeks after his placement at Renewal, Williams failed a drug test and was returned to DOC custody at the State Correctional Institution at Greene ("SCI – Greene"). ECF No. 81-3. The failed test was recorded as one of "several relapses to substance use while in SIP Level 3." ECF No. 81-12. After initial placement at SCI – Greene on August 7, 2017,  DOC transferred Williams to Quehanna on September 14, 2017 for reassessment. ECF No. 81-3. During his reassessment meeting with Defendant Godfrey, Williams refused to complete a self-assessment form and argued that "alcohol is not a drug." ECF No. 81-5 (misconduct record); see also, ECF No. 81-1 (Exhibit W (call #6) (audio recording of telephone call between Williams and his girlfriend, submitted as an exhibit by Williams)). Based on multiple failed drug and alcohol tests, Godfrey determined that Williams showed a lack of meaningful participation in treatment and issued a misconduct for violating program rules. Id.; ECF 81-4 at 68. Thereafter, Williams was transferred to SCI-Houtzdale and Hearing Examiner Nunez held a misconduct hearing.

Before the hearing, Williams submitted a request for assistance from private counsel and sought the participation of three witnesses who were staff or counselors at Quehanna. Id. at 3. The witnesses were proffered to testify to Williams' belated agreement to complete a self-assessment, his consent to Vivitrol treatment, and that he was "on board with rehab." Id.  None of the proposed witnesses would contradict evidence of Williams' positive drug test and, therefore, Nunez determined that witnesses were not needed to establish guilt or innocence of the misconduct. Nunez also rejected Williams' request for representation by counsel because misconducts are internal disciplinary matters, not judicial proceedings. ECF No. 81-8 at 20, 65. The disciplinary hearing report reflects that Nunez found a preponderance of evidence to establish that Williams failed multiple drug and alcohol tests, and that Williams was not honestly completing the reassessment process. ECF No. 81-5 at 4. Williams also "admitted in his written version to failing

both drug and alcohol tests while participating in SIP." Id.  Nunez submitted his finding to Somers to determine the appropriate sanction. ECF No. 81-8 at 59-63, 74; see also ECF No. 81-9. Williams appealed Nunez's finding through each level of DOC's grievance process, challenging timing (the violation was issued 8 days after meeting with Godfrey), vague violation language, the lack of witnesses, and Godfrey's characterization of him as combative. ECF No. 81-15. His internal appeal did not succeed.  Id.

After completion of the grievance process, Somers agreed that Williams showed a pattern of noncompliance with SIP program rules, including three instances of drug and alcohol usage. Somers imposed a sanction of 20 days of disciplinary custody, and decided to expel him from the SIP program. ECF No. 81-5 at 4-5; ECF No. 81-7 at 51, 89; ECF No. 81-12. Somers informed the sentencing judge that Williams violated program requirements and requested that the court conduct a hearing to revoke his original sentence to the SIP program and to resentence him. ECF No. 81-13. The Court held a hearing on January 17, 2018, resentenced Williams to a period of incarceration of 2.5 – 5 years, and allocated 742 days for time served. Commw. v. Williams, No. CP-02-CR-6938-2015 at 1, 3-4; and see, ECF No. 81-14. Williams was released from DOC custody approximately 8 months later. ECF No. 81-24 at 2. On August 14, 2018, Williams filed a motion for post-conviction relief, and the trial court appointed counsel to represent him. Commw. v. Williams, No. CP-02-CR-6938-2015 at 6. Counsel later moved to withdraw the petition, id., and this counseled civil rights action followed.

### B.      Nutrition and Medical Treatment

Williams' Eighth Amendment, ADA, and RA claims relate to the availability of supplemental nutrition and extended mealtimes during his second incarceration at Quehanna from September 14, 2017 to September 26, 2017. ECF No. 86 at 2.  Williams alleges that despite a

documented history of gastric bypass surgery, DOC personnel and Correct Care medical staff at Quehanna failed to provide medically necessary dietary accommodations, resulting in persistent vomiting and hunger. ECF No. 36 ¶¶ 21-25, 36, 45-46; ECF No. 81-2 at 13, 28.

Williams asserts that because of gastric bypass surgery, he has a smaller stomach and so typically eats five meals per day, comprised of 4 ounces of solid food or 8 fluid ounces. ECF No. 81-2 at 17, 28-30. If he eats more or eats too quickly, he is prone to vomit. This condition requires both supplemental nutrition and approximately 20 minutes to complete a small meal. ECF No. 81-2 at 25, 28.

Upon initial entry into DOC custody at SCI – Camp Hill in 2016, Williams advised medical personnel of his medical history and prior gastric bypass surgery, and was provided a medical pass permitting extra time to complete meals and supplemental meals bags to permit him to space out meals. ECF No. 81-24 at 7-8. Medical evaluations are repeated with each transfer. Upon arriving at Quehanna on May 23, 2016, Correct Care personnel evaluated Williams. He explained that due to the gastric bypass procedure, he cannot eat quickly. ECF No. 81-24 at 30. Medical staff flagged that a special diet was ordered, but Williams states the order was not continued. ECF No. 81-25 at 102, ECF No. 81-2 at 25. Williams found that if he disliked or could not tolerate food choices, he could set up a commissary account two to three weeks after his arrival at each facility, and then skip meals and supplement his diet with crackers, peanut butter, ice cream, and ramen noodles. ECF No, 81-2 at 27, 41-42, 44.

While at Quehanna, Williams encountered a military-style meal schedule for inmates participating in the DOC's Boot Camp program. In the Boot Camp program, inmates are provided ten to fifteen minutes to finish meals, and cannot remove any food from the mess hall. ECF No. 81-2 at 27-28. The DOC Defendants deny that Williams was subject to the Boot Camp meal timing

and restrictions. However, Williams asserts he could not eat slowly and so often vomited in the mess hall and could not finish meals. Id. at 49. This left him hungry, irritable, and fatigued. Id. Williams states that Quehanna staff members witnessed him vomiting and he submitted several DOC Inmate Request for Assistance forms asking for dietary accommodations. Williams has not produced the request forms, which were returned to him with staff responses, and none are available for review.[6]

After his positive drug test in late July 2017,Williams was transferred from Renewal to SCI – Greene on August 7, 2017. ECF No. 81-3. Williams requested dietary accommodations on September 9, 2017, including extra time to eat and snack bags. Both were approved by medical staff. ECF No. 81-25 at 74.  After transfer to Quehanna on September 14, 2017, Williams was evaluated by Correct Care medical staff and reported an ongoing dental issue. ECF No. 81-3; ECF No. 81-25 at 74-74. He requested a bottom bunk, an evening snack bag, and extra time to eat at meals. Id.  Medical staff conducted an exam, scheduled him for dental treatment, and granted his request for a bottom bunk. Patrick Nagle, a Correct Care physician assistant, reviewed Williams' records from his prior stay at Quehanna and observed that no dietary accommodations were provided. Thus, Nagle concluded that there was "[n]o medical indication for more time at meals or a snack bag." Id.  Williams' medical records reflect that he was seen and treated for dental issues, but do not reflect that he was seen after his initial intake for complaints or concerns related to dietary needs or accommodations. ECF No. 81-24 at 34. Williams asserts that his undocumented complaints to staff members regarding meals led to retaliation in the form of his expulsion from the SIP program and that he was disciplined by Quehanna staff for leaving the dining hall with

---

[6] Williams' DOC  grievance record reflects that he filed only two grievances during his incarceration at Quehanna; the first relates to a property claim and the second is the misconduct appeal related to his SIP expulsion. ECF No. 81-16.

food. ECF No. 86-2 (email from Godfrey regarding Williams' SIP reassessment and expected to SCI – Houtzdale notes that "Thurs., 21 Sep 17, he's being addressed by Lt. Cook for taking food out of the IDR.").

Williams was reevaluated by medical personnel on September 28, 2017, after his transfer to SCI – Houtzdale.  Williams again requested a dietary pass for longer mealtimes and a snack bag. ECF No. 81-25 at 70.  Medical personnel reviewed Williams' incarceration records and obtained his most recent surgical records reflecting an umbilical hernia repair. ECF No. 81-25 at 68. Based on the records review, medical personnel concluded that he had been "doing fine" without dietary accommodations and informed Williams he did not qualify for accommodation. ECF No. 81-25 at 70.

Williams' medical records also document alcohol use on February 9, 2017, and a "hot urine" test on August 7, 2017, when he admitted to drinking "a couple times." ECF No. 81-25 at 74, 79.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion ... a party ... fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Marten v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the court that no evidence supports the non-moving party's case. <u>Celotex</u>, 477 U.S. at 322; <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (<u>quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. <u>Matreale v. N.J. Dep't of Mil. & Veterans Affairs</u>, 487 F.3d 150, 152 (3d Cir. 2007); <u>Woodside v. Sch. Dist. of Phila. Bd. of Educ.</u>, 248 F.3d 129, 130 (3d Cir. 2001).

## III.    DISCUSSION

### A.  Eighth and Fourteenth Amendment Claims

Williams brings his Eighth and Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983. To maintain his claims, Williams must establish the violation of a right secured by the Constitution and the laws of the United States, and show that the alleged deprivation was committed by a person acting under color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). To be liable, "[a] defendant in a civil rights action must have personal involvement in the alleged

wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). The DOC Defendants and Correct Care move for judgment in their favor as a matter of law because, as to each of Williams' constitutional claims, he fails to establish that he was deprived a constitutional right or that an alleged deprivation was committed by a person amenable to suit or involved in the alleged wrongs. The Court addresses these arguments in order.

### 1. Fourteenth Amendment and Eighth Amendment claims – DOC and Quehanna

"Absent a state's consent, the eleventh amendment bars a civil rights suit in federal court that names the state as a defendant…." Laskaris v. Thornburgh, 661 F.2d 23, 25 (3d Cir. 1981). Pennsylvania has not waived its immunity from suit in federal court and while Congress can abrogate a state's sovereign immunity, it did not elect to do so in 42 U.S.C. §1983. Downey v. Pennsylvania Dep't of Corr., 968 F.3d 299, 310 (3d Cir. 2020). "Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, ... it shares in the Commonwealth's Eleventh Amendment immunity." Lavia v. Pennsylvania Dep't of Corr., 224 F.3d 190, 195 (3d Cir. 2000). Thus, Williams cannot maintain his constitutional claims against the DOC. Quehanna  is not a person for purposes of § 1983, and is a part of the DOC. Sims v. Wexford Health Sources, 635 F. App'x 16, 19 (3d Cir. 2015). Accordingly, judgment as a matter of law is properly entered in favor of the DOC and Quehanna as to Williams' Eighth and Fourteenth Amendment claims.

### 2. Due Process Claim – Godfrey, Somers, and Nunez

To establish a Fourteenth Amendment due process violation, Williams must show that: (1) he had a protected liberty interest in remaining in the SIP program, and (2) the procedures that led to the deprivation of his liberty interest were constitutionally insufficient. Sample v. Diecks, 885 F.2d 1099, 1113 (3d Cir. 1989). Under the facts and evidence presented here, construed in the

light most favorable to Williams as the non-moving party, Williams' due process claim fails as a matter of law because he had no protected liberty interest in continued participation in the SIP program or any program component, and the named DOC Defendants provided Williams the process that was due in reaching a finding that he violated the program rules and guidelines.[7]

"A protected liberty interest may arise from only one of two sources: the Due Process Clause or the laws of a state." Asquith v. Dep't of Corr., 186 F.3d 409 (3d Cir. 1999). The United States Court of Appeals for the Third Circuit has characterized the former as an "independent due process liberty interest and the latter as a state-created liberty interest." Powell v. Weiss, 757 F.3d 338, 341 (3d Cir. 2014). "If there is no constitutionally protected interest, our inquiry stops.  If, however, we 'determine that the interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it.'" Evans v. Sec'y Pennsylvania Dept. of Corr., 645 F.3d 650, 663 (3d Cir. 2011) (quoting Newman v. Beard, 617 F.3d 775, 783 (3d Cir. 2010)).

---

[7] Williams appears to conflate his due process claim related to DOC disciplinary proceedings with a claim that his expulsion "resulted in additional confinement" in the form of a longer sentence. ECF No. 86 at 15. A claim related to the length of Williams' confinement is not cognizable in this federal civil rights action because success of the claim would call into question the validity of his original sentence and resentencing by the state trial court. "[T]o recover damages for the allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" Heck v. Humphrey, 512 U.S. 477, 486-87 (1994) (footnote and citation omitted); see also Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation) -- no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) -- if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis omitted)). "Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Heck, 512 U.S. at 487. See also Abbott v. Pennsylvania Dep't of Corr., 426 F. App'x 42, 43 (3d Cir. 2011) (per curiam) ("Under Heck ... a civil-rights plaintiff cannot recover damages for harm caused by actions that implicate the length of his confinement unless he can prove that the erroneous calculation has been reversed, invalidated, or called into question by a grant of federal habeas corpus relief."). Williams' criminal docket reflects that he filed a Post Conviction Relief Act ("PCRA") petition in August 2018 and, with participation of appointed counsel, withdrew the petition in October 2018.  Commw. v. Williams, No. CP-02-CR-6938-2015 at 6. Thus, to the extent that Williams asserts that his resentencing is erroneous or deprived him of a protected liberty interest, his claim is not properly before the Court.

In the prison context, an independent due process interest may be triggered when "'severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing.'" Evans. 645 F.3d at 663 (quoting Renchenski v. Williams, 622 F.3d 315, 325 (3d Cir. 2010)). In Asquith, the Third Circuit held that revocation of an inmate's right to participate in a community release program upon failing a Breathalyzer test did not violate his due process rights, despite a subsequent finding that he was not guilty of the offense. The New Jersey Department of Corrections also failed to provide a hearing to determine whether the inmate should be returned to the program. 186 F.3d at 409. Despite a change in the conditions of his custody, the Third Circuit found the plaintiff did not suffer a change in confinement to trigger a protected liberty interest. During the plaintiff's stay at the halfway house, he could not live in his own home, was subject to a curfew, and while he could leave the halfway house, he had to sign in and out, and only use public transportation. If he could not be contacted within two hours, he would be considered an escapee and charged as such. The plaintiff was also required to submit to random urine monitoring and room searches. Id. at 410-11. "'[I]f a program member was merely *charged* with a violation, he would be returned to a correctional facility.' Moreover, the Commissioner is authorized 'at any time [to] transfer an inmate from one place of confinement to another.'" Id. (internal citations omitted) (italics in original).

"These restrictions are dispositive because they amount to institutional confinement …. The United States Supreme Court has consistently held that while a prisoner remains in institutional confinement, the Due Process Clause does not protect his interest in remaining in a particular facility." Id. (citing Montanye v. Haymes, 427 U.S. 236, 242 (1976) ("the Due Process Clause by its own force [does not] require [ ] hearings whenever prison authorities transfer a prisoner to another institution … so long as the conditions or degree of confinement to which the

prisoner is subjected are within the sentence imposed upon him….”). See also Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 225 (3d Cir. 2015) (“courts recognize that a state's authority to place inmates anywhere within the prison system is among 'a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.' Consequently, custodial personnel do not infringe an inmate's liberty interests by placing her in one custodial facility rather than another.”) (internal citation omitted).

Here, Williams had no protected liberty interest to remain in the SIP program. Before his failed drug test, Williams remained in confinement at Renewal, residing in a strictly monitored community half-way house, subject to personal searches, drug and alcohol testing whenever requested, and to strict rules forbidding the use of alcohol or drugs, possession of money, and unauthorized travel. Williams affirmatively acknowledged that a term of his participation included automatic revocation for “[a]ny drug consumption or positive-tested urine.” ECF No. 81-11. The DOC retained the discretion to transfer him at any time from one institution to another and back and forth between less or more restrictive settings such that he remained in “institutional confinement” throughout the duration of the SIP program. Thus, Williams had no independent due process liberty interest to remain in the SIP program.[8]

Williams similarly did not suffer the deprivation of a state-created liberty interest. “In Sandin v. Conner, 515 U.S. 472 (1985), the United States Supreme Court held that a prisoner is deprived of a state-created liberty interest if the deprivation 'imposes atypical and significant

---

[8] Williams' reliance on Berry v. United States, 412 F.2d 189 (3d Cir. 1969) as support for a cognizable liberty interest to remain in the SIP program is misplaced. Berry was unaware that in entering a guilty plea for the charges at issue, he was statutorily ineligible for a reduction of his fifteen-year sentence for good conduct, and would be required to serve his entire sentence of fifteen years in confinement. The Third Circuit thus concluded that his plea must be vacated because by entering the plea, he was subject to the unconditional loss of probation and parole and therefore could not knowingly weigh the consequences of his plea. Failing to successfully complete a pre-release program, however, does not implicate the loss of a recognized right to be considered for parole and Williams does not point to any authority to the contrary. Moreover, in this case, Williams does not contend he was unaware of program conditions.

hardship on the inmate in relation to the ordinary incidents of prison life." Powell, 757 F.3d at 344 (parallel citations omitted). "In this inquiry, we do not compare the prisoner's own life before and after the deprivation.  Rather, '[t]he baseline for determining what is 'atypical and significant' – the 'ordinary incidents of prison life' – is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law.'" Id. (quoting Asquith, 186 F.3d at 412)). In Powell, the Third Circuit held that a prisoner who lost his pre-release status and anticipated transfer to a community correctional center through no fault of his own was not subjected to an "'atypical or significant hardship' for a convicted criminal." Id. at 345-46 (citing Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000); and id. at 344 (citing Callender v. Sioux City Residential Treatment Facility, 88 F.3d 666, 669 (8th Cir. 1996) (revoking an inmate's prerelease status, removing him from work release, and returning him to prison did not deprive him of a liberty interest.")).[9]

Even if the Court were to conclude that Williams had a protected liberty interest to participate in the SIP program, the remaining question to be resolved is what process is due. Williams cites to DOC's internal disciplinary procedures; Wolff v. McDonnell, 418 U.S. 539, 563-73 (1974) (loss of good-time credit); and Woods v. Marks, 742 F.2d 770 (3d Cir. 1984) (placement in disciplinary housing for two back-to-back six-month terms), for the proposition that a prisoner cannot face disciplinary sanctions absent procedural protections that include the right to call witnesses and a hearing representative. ECF No. 86 at 16. The cases cited by Williams predate Sandin and have no application where there is no cognizable liberty interest at stake. Further, "[p]rison officials have broad discretion in administering a disciplinary hearing, see Young v.

---

[9] Williams does not allege the denial of a state created protected liberty interest in his disciplinary housing placement for twenty days and any such claim would not implicate a liberty interest. See Sandin, 515 U.S. at 487 (a thirty-day punitive segregation in prison is not an atypical or significant hardship for an inmate and thus does not implicate a protected liberty interest to which the Due Process Clause would apply).

Kann, 926 F.2d 1396, 1400 (3d Cir. 1991), and it is not a denial of due process to deny an inmate an opportunity to present witnesses 'whose testimony would be irrelevant, repetitive, or unnecessary.'" Moles v. Holt, 221 F. App'x 92, 95 (3d Cir. 2007) (per curiam) (quoting Pannell v. McBride, 306 F.3d 499, 503 (7th Cir. 2002)).

In this case, Nunez, in the capacity of hearing examiner, concluded that the proposed witness testimony related to Williams' belated agreement to complete the reassessment paperwork, to participate in medication-based treatment, and to be "on board" with rehabilitation. As Nunez explained in the hearing report, none of this evidence would establish guilt or innocence of the charge that Williams violated the conditions of the SIP program by failing multiple drug and alcohol tests, and the proposed testimony was deemed unnecessary. ECF No. 81-5. Wolff, 418 U.S. at 566 ("[a]lthough we do not prescribe it, it would be useful for the [disciplinary committee] to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases"). Thus, the lack of Williams' requested witnesses did not lead to the loss of his ability to challenge the basis of his removal (failed drug tests) or impact the result. As to representation by counsel, Williams fails to allege that he suffered the inability to represent himself, despite his ongoing treatment for alcoholism, and he fails to point to any condition requiring representation on his behalf. Id. at 570 (declining to hold that inmates have a right to retained or appointed counsel in disciplinary proceedings).

For each of these reasons, and construing the evidence in the light most favorable to Williams as the nonmoving party, the DOC Defendants' Motion for Summary Judgment as to Williams' Fourteenth Amendment due process claim is properly granted as a matter of law.

### 3. Eighth Amendment Nutrition and Medical Claims – DOC Defendants

The DOC Defendants also seek summary judgment as to Williams' Eighth Amendment claims against Godfrey, Nunez, and Somers arising out of the alleged deprivation of adequate nutrition in September 2017 because there is no evidence establishing their personal involvement in the alleged misconduct. ECF No. 82; ECF No. 83 at 4-9.[10]

It is well established that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." Baraka v. McGreevey, 481 F.3d 187, 210 (3d Cir. 2007) (internal citation and quotation marks omitted). Personal involvement in the alleged wrongdoing may be shown "through allegations of personal direction or of actual knowledge and acquiescence." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d at 1207). See also Ruff v. Health Care Adm'r, 441 F. App'x 843, 846 (3d Cir. 2011) (per curiam) ("[t]o be liable under § 1983, a defendant must have some personal involvement in the underlying unconstitutional conduct"). See Rode, 845 F.2d at 1207-08 ("[a]llegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity" such as stating time, place and persons responsible").

Liability of an individual government defendant also cannot be predicated on the unconstitutional conduct of his or her subordinate. Evancho v. Fisher, 423 F.3d at 353 (quoting

---

[10] The DOC Defendants also maintain that Williams cannot establish that he suffered a substantial deprivation of food to support an Eighth Amendment claim. Given the resolution of the DOC Defendants' remaining arguments, the Court need not address a basis for relief that raises an apparent disputed issue of fact. "Under the Eighth Amendment, …, inmates must be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to their health and well being." Duran v. Merline, 923 F. Supp. 2d 702, 720 (D.N.J. 2013) (citing Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir.1983) and quoting Ramon v. Lamm, 639 F.2d 559, 571 (10th Cir. 1980)). "[U]nder certain circumstances, a substantial deprivation of food may well be recognized as being of constitutional dimension." Id.

Rode, 845 F.2d at 1207); Baraka v. McGreevey, 481 F.3d at 210 (a supervisor can only be held liable if his or her own actions resulted in the constitutional injury).   "Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004).

Williams asserts that he submitted "routine requests regarding his needs at QBC and inability to eat." ECF No. 86 at 9. Williams does not identify the recipient of any request, and does not allege that he informed Godfrey, Nunez, or Somers of his need for supplemental nutrition or longer meals. Rather, Williams states he met with Godfrey only twice over the course of his confinement at Quehanna, once when he was transferred to Renewal, and once in September 2017. The later meeting lasted for three minutes and they discussed Williams' refusal to complete the SIP reassessment. ECF No. 81-2 at 63.  Williams suggests that Godfrey knew of his dietary issues because the misconduct referral states that Williams was disciplined once for leaving the dining hall with food, in violation of institutional rules. ECF No. 86 at 4-5. This evidence, viewed in the light most favorable to Williams, does not reasonably infer that Godfrey knew that Williams required dietary accommodations or that Godfrey participated in denying Williams' requested accommodations to support liability under the Eighth Amendment. Further, Williams' contact with Nunez only occurred after he left Quehanna, and Williams did not have any contact with Somers during his incarceration. Id. at 60-63. Under these circumstances, construing the evidence in the light most favorable to Williams as the nonmoving party, Williams does not establish a basis for § 1983 liability arising out of personal involvement of Godfrey, Nunez, or Somers in the alleged violation of his constitutional rights.

As an alternative basis for liability, Williams contends that there are policies and practices in place at Quehanna that led to his inability to see a doctor, and that permitted a physician assistant to enter an order denying previously approved accommodations. He also alleges a lack of training and guidelines to accommodate prisoners who required additional time to eat. Id.  None of these bases for liability point to the involvement of any named individual defendant, and Williams points to no evidence giving rise to an inference that Godfrey, Nunez, or Somers effectuated policies or procedures that impacted the conditions of his confinement at Quehanna. Accordingly, the DOC Defendants' motion for summary judgment is properly granted as to Williams' Eighth Amendment claims.

### 4. Eighth Amendment Medical Claims – Correct Care

As with his claims against the DOC Defendants, Williams may prevail on his claim for relief against Correct Care under § 1983 by showing that he was (1) deprived of a federal right (2) by a person acting under color of state law. Correct Care does not dispute that it is "a person acting under color of state law." West v. Atkins, 487 U.S. at 54-57 (private physicians contracted to perform services to a state prison within prison confines are acting under color of state law to support a § 1983 claim). Instead, Correct Care seeks entry of summary judgment in its favor as a matter of law because Williams has not presented evidence that it or any employee acted with the requisite deliberate indifference to support Williams' Eighth Amendment claim or caused him to suffer the deprivation of any right.[11] ECF No. 85 at 9.

To establish a violation of the Eighth Amendment's prohibition on cruel and unusual punishment based on medical care, a plaintiff must show deliberate indifference to a serious

---

[11] Correct Care also contends that it has no responsibility and thus no liability for Williams' expulsion from the SIP program – a point Williams acknowledges. Therefore, Williams confirms that his only claim against Correct Care is an Eighth Amendment claim for deliberate indifference to his serious medical condition. See ECF No. 85 at 1-9 and ECF No. 87 at 1.

medical need. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." <u>Monmouth Cty. Corr. Institutional Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987). To act with deliberate indifference to such a medical need is to recklessly disregard "a substantial risk of serious harm." <u>Farmer v. Brennan</u>, 511 U.S. at 839; <u>Giles v. Kearney</u>, 571 F.3d 318, 330 (3d Cir. 2009).

"[D]eliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." <u>Pearson v. Prison Health Serv.</u>, 850 F.3d 526, 535 (3d Cir. 2017). Thus, deliberate indifference has been found where a prison official "knows of a prisoner's need for medical treatment but intentionally refuses to provide it[,]" or "prevents a prisoner from receiving needed or recommended medical treatment." <u>Rouse v. Plantier</u> , 182 F.3d 192, 197 (3d Cir. 1999) (citing <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 68 (3d Cir. 1993)). <u>See also</u>, <u>Monmouth Cty. Corr. Institutional Inmates</u>, 834 F.2d at 346-47). Claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference. <u>Rouse</u>, 182 F.3d at 197.

> "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" <u>Id.</u> at 105; <u>see also</u> <u>Durmer v. O'Carroll</u>, 991 F.2d 64, 67 (3d Cir. 1993) ("[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation."); <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990) ("[C]ertainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness.") (emphasis omitted). "Deliberate indifference," therefore, requires "obduracy and wantonness," <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 842 (1994) (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm").

Rouse, 182 F.3d at 197 (parallel citations omitted); see also Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) ("[a]llegations of medical malpractice are not sufficient to establish a Constitutional violation.").

> Because "mere disagreement as to the proper medical treatment" does not "support a claim of an eighth amendment violation," Monmouth Cty. Corr. Inst. v. Lanzaro, 834 F.2d 326, 346 (3d. Cir. 1987), when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care. See Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights").

Pearson, at 535. That said, prison medical providers may not, with deliberate indifference to the serious medical needs of the inmate, choose "an easier and less efficacious treatment" of the inmate's condition. West v. Keve, 571 F.2d 158, 162 (3d Cir. 1978) (quoting Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment ... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" Monmouth County Corr. Institutional Inmates, 834 F.2d at 346 (quoting Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir. 1976)).

With particular relevance here, when a plaintiff seeks to hold a corporation liable for the deliberate indifference of its employees under the Eighth Amendment, he must point to a corporate policy or custom that that demonstrates the requisite deliberate indifference.  See e.g., Parkell v. Danberg, 833 F.3d 313, 338 (3d Cir. 2016) ("It is not enough for [a plaintiff] to show that a medical staffer was deliberately indifferent to his needs, because [a contractor] cannot be held responsible for the acts of [their] employees under a theory of respondeat superior or vicarious liability. [The plaintiff] must impute that deliberate indifference to [the contractor] by showing that they turned a blind eye to an obviously inadequate practice that was likely to result in the violation of

constitutional rights' such that they, as policymaker[s,] can reasonably be said to have been deliberately indifferent to the need.") (internal citations and quotation marks omitted)).

In this case, Williams was transferred from SCI – Greene to Quehanna on September 14, 2017.  ECF No. 81 ¶ 122.  On September 18, 2017, Williams was seen by Melissa Wooster, a Correct Care nurse, and Nagle, a Correct Care physician assistant.  Id. at ¶¶ 123-24. Williams was transferred to SCI – Houtzdale on September 26, 2017.

Williams contends that upon his initial medical examination at Quehanna on September 18, 2017, he disclosed that because of gastric bypass surgery, he required supplemental nutrition and longer mealtimes. ECF No. 87 at 7. It is undisputed that Nagle denied these requests based on his review of Williams' records from his 2016 incarceration at Quehanna. Williams alleges that Nagle deliberately and wantonly overrode a current physician's order in place to ensure that Williams received adequate nutrition. Coupled with repeated requests to staff for assistance and sick call requests that went unanswered, Williams argues he has established deliberate indifference by Correct Care personnel sufficient to sustain his claim at this stage of the litigation. Id.

It is critical to note that Williams did not name Nagle or any other Correct Care medical provider as a defendant in this action.  Thus, to succeed on his claim against Correct Care, Williams must present evidence sufficient to permit a factfinder to conclude that Nagle's alleged deliberate indifference "can be attributed" to Correct Care. Parkell 833 F.3d at 338.  To that end, Williams contends that Correct Care failed to adopt procedures to ensure that a physician assistant cannot override a doctor's prior orders for medical treatment, and that it failed to coordinate care to ensure that upon transfer, each facility has access to a current and complete copy of medical records so that lapses in existing orders are avoided. Id. at 5-6, 8.  Williams asserts that because of these

22

lapses, he was denied adequate nutrition for nearly two weeks and suffered persistent vomiting. Id. at 4, 7-8, 9.

Regarding Williams' medical records claim, the only evidence presented is the testimony of Deborah Cutshall, who served as Correct Care's Healthcare Services Administrator at Quehanna until 2014.[12] Her testimony indicates that pursuant to DOC policy, DOC manages all inmate records and after Correct Care providers enter information into an inmate's records, "DOC owns those records, and they take care of them." ECF No. 81-20 at 6. As such, she has no knowledge as to how records are transferred between facilities. In addition, there is no evidence that Correct Care was able to effectuate policy regarding inmate medical records and, importantly, Williams presents no evidence that Correct Care was aware that the DOC records retention policy impeded care in this instance or any other, upon which a finding of deliberate indifference may rest.

Williams' claim as to Correct Care's failure to adopt policies to prevent a physician assistant such as Nagle from overriding existing physician orders also fails. The only evidence on this point, also from Cutshall, establishes that a physician assistant was "absolutely not" permitted to override a physician's orders or orders issued by a nutritionist. Id. at 6, 8. Thus, there is no evidence to suggest that Nagle's decision to deny supplemental nutrition or extra time at meals resulted from the absence of a Correct Care policy or could be attributed to Correct Care in any way. Moreover, there is also no evidence that Correct Care leadership were aware that physician assistants were overriding existing medical orders, or that they would have known that Nagle did so in time to intervene. Under these circumstances, as in Parkell, there is no evidence that Correct Care "turned a blind eye to an inadequate practice happening on its watch." Parkell, at 340. The evidence, viewed in the light most favorable to Williams as the nonmoving party, therefore fails

---

[12] Not only did Williams not name Nagle as an individual defendant in this case, but it also appears that Williams never deposed Nagle.

to establish that Correct Care acted with the requisite degree of deliberate indifference to support liability under the Eighth Amendment. Based upon the foregoing, the Motion for Summary Judgment filed on behalf of Correct Care as to Williams' Eighth Amendment claim is granted.

### B.  ADA and RA Claims

Williams asserts claims against the DOC and Quehanna under Title II of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act (the "RA"), both of which proscribe discrimination against a "qualified individual with a disability." See 42 U.S.C. § 12132 (stating that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"); see also 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). The law has long recognized that Section 504 of the Rehabilitation Act and Title II of the ADA apply to state operated correctional facilities. Yeskey v. Com. of Pa. Dep't of Corr., 118 F.3d 168, 172 (3d Cir. 1997), aff'd sub nom. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998).

As to both claims, the DOC Defendants seek entry of judgment in their favor as a matter of law on four grounds: first, because Williams is not "disabled" under either statute; second, because Williams testified that he was not discriminated against because of an alleged disability; third, because the DOC reasonably accommodated Williams through access to the prison commissary to purchase snacks; and fourth, because Williams fails to establish a viable Fourteenth Amendment claim against the DOC, and thus cannot sustain an ADA or RA claim. The Court resolves each argument in order.

The United States Court of Appeals for the Third Circuit has instructed that "the substantive standards for determining liability under the Rehabilitation Act and the ADA are the same." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 275 (3d Cir. 2014). To maintain a claim under either statute, a plaintiff must establish "that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." Furgess v. Pennsylvania Dep't of Corr., 933 F.3d 285, 288-89 (3d Cir. 2019).

To qualify as disabled, Williams must prove that a physical impairment (1) actually "substantially limits one or more of the major life activities," (2) a record of such impairment, or (3) that he is regarded as having such an impairment. 42 U.S.C. § 12102. The statute defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, …." Id. § 12102(2). "The question of whether an individual is substantially limited in performing a major life activity is a question of fact. Therefore, the Court must determine if plaintiff has presented sufficient evidence from which a reasonable jury could infer that plaintiff was substantially limited in his ability to perform a major life activity." Wilson v. Iron Tiger Logistics, Inc., 62 F. Supp. 3d 412, 415–16 (E.D. Pa. 2014), aff'd, 628 F. App'x 832 (3d Cir. 2015) (citing Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 763 (3d Cir. 2004)).

Williams testified in his deposition that as a result of the reduced size of his stomach, he can eat only four ounces of solid food or eight ounces of liquid at each meal. If he eats more, or if he eats too quickly, he vomits. ECF No. 81-2 at 17-19, 48-49. The Court finds that Williams presents sufficient evidence to permit a jury to infer that he is substantially limited in his ability to eat and digest a nutritionally adequate diet and thus is "disabled". The record further leads to a

reasonable inference that because of his disability, Williams could not participate in meals, as provided, at Quehanna and therefore suffered from persistent hunger and fatigue.

Alternatively, the DOC Defendants posit that because Williams "*chose*" to undergo gastric bypass surgery, he does not have an underlying physiological condition that changes his eating habits.   ECF No. 83 at 13 (italics in original). Neither the ADA nor the RA condition the application of anti-discrimination laws on the reasons for a disability and absent precedential authority requiring it do so, the Court will not engage such an analysis.

The DOC Defendants next contend that there is no evidence to suggest that Williams suffered discrimination because of his disability. Id. at 14. To recover under the ADA, Williams must establish that he was subject to discrimination because of his disability and that the deprivation was intentional – that is, discrimination occurred due to deliberate indifference to his disability. To that end, the DOC Defendants point to Williams' deposition testimony that he was not discriminated against. ECF No. 81-2 at 54-55. Yet, Williams later clarified: "No. In answer to your question. *Other than the food thing,* there was no – no race issues, no weight issues, no age issues, none of that stuff. *Other than the physical stuff, which I think rubbed some people the wrong way.*" Id. (emphasis added). The testimony cited by the DOC, construed in the light most favorable to Williams, does not resolve the issue. Instead, as to intent, Furgess, *supra*,  is instructive.

In Furgess, the Third Circuit held that deliberate indifference is established with evidence that (1) the DOC had "knowledge that a federally protected right is substantially likely to be violated," and (2) the prison failed 'to act despite that knowledge.'" Id. at 292. In the case before it, the court found that an inmate-plaintiff who was denied access to a handicapped-accessible shower during a three-week stay in a restricted housing unit ("RHU") sufficiently alleged the requisite intent to survive a motion to dismiss an ADA claim. Id., 933 F.3d at 291 (and id., n. 27,

noting that the plaintiff need only establish deliberate indifference under both the ADA and the RA).

As to the first prong, the Third Circuit found that the plaintiff satisfactorily alleged (1) that the DOC knew about his need for an accessible shower facility based on its prior grant of a request while plaintiff was housed in general population, (2) he submitted multiple requests while housed in the RHU, and (3) he alleged that the RHU Lieutenant and the Superintendent "knew that Furgess had not been able to shower because the RHU showers were not handicapped accessible." Id. at 292. The second prong was satisfied with allegations that for three months, the DOC provided no accommodation that would allow him to shower. Id.

In the instant case, Williams' testimony and medical records establish that the DOC accommodated his disability with longer meals and supplemental nutrition while he was incarcerated at SCI – Camp Hill and SCI – Greene, and that his requests for these accommodations were denied at Quehanna and SCI – Houtzdale. Williams testified that he submitted several requests to Quehanna staff requesting meal accommodations. While Williams has not produced the forms, his deposition testimony under oath presents an issue of fact, and therefore a jury question, as to whether DOC or Quehanna administrators and staff were aware of these requests. Finally, Williams testified that throughout his September 2017 incarceration at Quehanna he was denied longer mealtimes and supplemental nutrition, and that he often vomited in front of DOC personnel, leading to hunger, fatigue, and irritability. This evidence is sufficient to present a genuine dispute of material fact related to DOC knowledge that he could not maintain a nutritionally adequate diet over a sustained period, precluding the entry of judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("'Credibility determinations,

the weighing of evidence, and the drawing of legitimate inferences from those facts' are matters left to the jury.").

The DOC alternatively suggests that Williams was accommodated through the ability to purchase snacks at Quehanna's commissary. This argument is directly contradicted by Williams' testimony that it takes three weeks to establish a commissary account and his second incarceration at Quehanna was about two weeks long. ECF No. 81-2 at 41-44. Thus, Williams' commissary purchases and DOC's contention that it reasonably accommodated Williams' disability raise factual disputes not appropriate for resolution through the pending motion. Id.; ECF No. 81-6.

DOC's final basis for relief is asserted through a footnote and requires the Court to resolve whether sovereign immunity bars Williams' claims for monetary damages under the ADA and RA because he does not assert a viable Eighth Amendment or Fourteenth Amendment due process claim against the DOC and Quehanna. ECF No. 83 at 11 n. 3.

Title II of the ADA abrogates state sovereign immunity when it comes to state conduct that violates the Constitution. United States v. Georgia, 546 U.S. 151, 159 (2006). A three-step analysis is used to determine whether abrogation is properly found:

> (1) identify which aspects of the State's alleged conduct violated Title II; (2) identify to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, determine whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 553 (3d Cir. 2007). If a claim violates Title II but not the Fourteenth Amendment, the court must determine whether there is '"a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" Tennessee v. Lane, 541 U.S. 509, 520 (2004) (quoting City of Boerne v.

Flores, 521 U.S. 507, 520 (1997)). See also Shaw v. Pennsylvania Dep't of Corr., No. 17-229E, 2018 WL 6831148 (W.D. Pa. Dec. 12, 2018).

In this case, Williams has presented evidence to the first step of the Bowers analysis: that the DOC violated Title II by failing to accommodate his disability to permit him meaningfully access to meals – a vital service offered all prisoners in DOC custody. Shaw, 2018 WL 6831148, at * 7.

"[T]he second step of the Bowers analysis requires the Court to determine whether the same alleged conduct also implicates the Fourteenth Amendment." Id. (citing Bowers, 475 F.3d at 553). The Court finds that Williams presents sufficient evidence to the second step to sustain his ADA claim at this stage of the litigation.

> The United States Supreme Court has held that the "refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs ... independently violate[s] the provisions of § 1 of the Fourteenth Amendment." United States v. Georgia, 546 U.S. at 157. Other courts, including the Third Circuit, have reached the same conclusion. See Farmer v. Brennan, 511 U.S. 825, 832 (1994) (noting that prison officials must provide inmates with adequate food, clothing, shelter and medical care); Lindsey v. O'Connor, 327 Fed. Appx. 319, 321 (3d Cir. 2009) (denial of food to inmates violates the Constitution where the deprivation is substantial); Dinkins v. Correctional Medical Services, 743 F.3d 633, 634-35 (8th Cir. 2014) (alleged "denials of meals and adequate housing by reason of [a] disability" can form the basis for a viable ADA claim); Jaros v. Ill. Dept. of Corrections, 684 F.3d 667, 672 (7th Cir. 2012) ("Adequate food and facilities to wash and use the toilet are among the minimal civilized measure of life's necessities that must be afforded prisoners") (internal quotations omitted). Based on Plaintiff's allegation that she has been denied the ability to participate in meals and other vital services, the DOC's refusal to provide her with reasonable accommodations, if substantiated through discovery, might rise to the level of a Constitutional injury for purposes of the Bowers abrogation analysis.

Shaw, 2018 WL 6831148, at * 7; see also United States v. Georgia, 546 U.S. at 157 ("the Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment").

Because the denial of adequate nutrition over a period of nearly two weeks implicates Fourteenth Amendment guarantees, the Court need not determine the proportionality of the injury and the means to prevent it. Thus, while sovereign immunity bars Williams' independent Eighth Amendment claims against DOC and Quehanna, he presents sufficient evidence to raise a jury question as to the alleged violation of his rights under the ADA and RA. See Baxter v. Pennsylvania Dep't of Corr., 661 F. App'x 754, 757-8 (3d Cir. 2016) (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 277 (2d Cir. 2003) ("Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation.")).   The DOC Defendants' Motion for Summary Judgment as to Williams RA and ADA claims is denied.

## IV.    CONCLUSION

For the foregoing reasons, the DOC Defendants' Motion for Summary Judgment, ECF No. 82, is properly granted as to Williams' Eighth and Fourteenth Amendment claims but denied as to his ADA and RA claims. Correct Care's Motion for Summary Judgment also is properly granted. An appropriate Order will follow.

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE


Dated: December 3, 2021


cc:     All counsel of record by Notice of Electronic Filing

30